*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CV-0523

MARK Z. JACOBSON, PH.D., APPELLANT,

V.

CHRISTOPHER T. M. CLACK, PH.D., *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2017-CA-006685-B)

(Hon. Elizabeth C. Wingo, Trial Judge)

(Submitted January 12, 2023                    Decided February 15, 2024)

*Mark Z. Jacobson*, pro se.

*Evangeline C. Paschal* was on the brief for appellee National Academy of Sciences.

*Drew W. Marrocco* was on the brief for appellee Christopher T. M. Clack.

Before MCLEESE and DEAHL, *Associate Judges*, and GLICKMAN, *Senior Judge*.

Opinion for the court by *Associate Judge* DEAHL.

Concurring opinion by *Associate Judge* DEAHL at page 29.

DEAHL, *Associate Judge*:  Mark Jacobson filed a defamation suit after a scientific journal published an article criticizing a research paper of his.  Jacobson

sued the article's lead author, Christopher Clack, and the National Academy of Sciences ("NAS"), which publishes the journal. Jacobson sought more than $10 million in damages from each of them. Clack and NAS filed special motions to dismiss under the District of Columbia Anti-Strategic Lawsuits Against Public Participation Act, or Anti-SLAPP Act, D.C. Code §§ 16-5501–5505. The trial court held a hearing on the motions and hinted that it was likely to grant them. Two days later, before the trial court ruled, Jacobson voluntarily dismissed his suit.

Clack and NAS moved for attorneys' fees under the Anti-SLAPP Act's fee-shifting provision, which allows a court to award attorneys' fees to a defendant who "prevails in whole or in part" in their special motions to dismiss. D.C. Code § 16-5504(a). The court granted the motion for attorneys' fees, awarding $428,723 to NAS and $75,000 to Clack. Jacobson now appeals that award and argues that his voluntary dismissal of his suit means that Clack and NAS did not "prevail" as is required before attorneys' fees can be awarded. That raises a question of first impression for this court: whether and when a party can be said to have prevailed in a special motion to dismiss that is followed by a voluntary dismissal of the suit. We agree with the trial court that NAS and Clack prevailed in their motions to dismiss and therefore were appropriately awarded attorneys' fees, and so we affirm.

**I.**

Mark Jacobson is a professor at Stanford University. In 2015, he was the lead author on a paper published in *The Proceedings of the National Academy of Sciences* ("PNAS"), which concluded that the U.S. power grid could inexpensively move to "100% wind, water, and solar" energy sources by 2050 without the need for "natural gas, biofuels, nuclear power, or stationary batteries." PNAS gave Jacobson and his research team one of its annual awards for making an "outstanding contribution" to the field of applied environmental sciences.

Christopher Clack co-authored an article in 2017, also published in PNAS, that was very critical of Jacobson's methodologies and conclusions. Clack's paper posited that Jacobson's study "used invalid modeling tools, contained modeling errors, and made implausible and inadequately supported assumptions." Clack and his co-authors provided detailed calculations and reasons for questioning Jacobson's conclusions, which they said "are not supported by adequate and realistic analysis and do not provide a reliable guide to whether and at what cost such a transition might be achieved." The article continued: "[T]he weight of the evidence suggests that a broad portfolio of energy options will help facilitate an affordable transition to a near-zero emission energy system."

Before publishing Clack's critique, PNAS sent the article to Jacobson for comment, and his responses were forwarded to Clack and his co-authors, who made some minor revisions. PNAS also allowed Jacobson and his co-authors to write a rebuttal to Clack's article, to be published alongside it. Jacobson did not think that was sufficient and instead insisted that Clack's article be shelved entirely. He informed a PNAS editor over email that he had retained an attorney who would send a cease-and-desist letter, and he threatened to seek a preliminary injunction to prevent publication of Clack's critique. PNAS nonetheless printed both Clack's article and Jacobson's rebuttal in the same issue and posted them online simultaneously. In his rebuttal piece, Jacobson asserted that it was Clack's analysis, not his, that was "riddled with errors" and contained "demonstrably false" claims.

Jacobson sued Clack and NAS in D.C. Superior Court.[1] He alleged that Clack's article consisted of "egregious falsehoods and misstatements" that injured his reputation. Jacobson asserted claims of defamation against both Clack and NAS, and additional promissory estoppel and breach-of-contract claims against NAS on the theory that the journal violated its editorial policies by publishing Clack's article. He sought damages "believed to be in excess of" $10 million each from Clack and

---

[1] NAS is based in the District of Columbia. It is a private, non-profit organization established by an Act of Congress "to provide independent objective advice to the nation on matters related to science and technology."

NAS, punitive damages, and a retraction of Clack's article. Two weeks after filing the lawsuit, Jacobson submitted to PNAS "errata," responsive to some of the points raised in Clack's article, to "clarify our hydropower assumption because the original text describing this assumption was not clear." NAS and Clack each filed special motions to dismiss under the District's Anti-SLAPP Act. D.C. Code § 16-5502. Jacobson opposed the motions and, separately, sought targeted discovery. The trial court denied Jacobson's discovery request and held a hearing on the special motions to dismiss.

At the hearing, the trial judge expressed serious skepticism about Jacobson's chances of success on the merits. In questioning Jacobson's counsel, she said that "criticizing ideas is not defamation" and "[w]hether it offends you is not the standard." The judge distinguished between assertions of inaccuracies and assertions of misconduct—the former being fodder for scientific disagreement and the latter potentially actionable as defamation. She noted that Clack's article never claimed that Jacobson "falsified data, [] engaged in misconduct, [or] deliberately misled the public." The judge seemed to agree with NAS and Clack that this was a paradigmatic scientific disagreement—not one to be hashed out and resolved in court. She suggested at one point that, if anything, it was Jacobson's characterizations of Clack's article, rather than vice versa, that might "be capable of

defamatory interpretation." She told the parties that she would issue a written decision "promptly" and adjourned.

Two days later, before any ruling, Jacobson voluntarily dismissed his suit under Superior Court Civil Rule 41(a)(1)(A)(i). That rule provides that a "plaintiff may dismiss an action without a court order by filing . . . a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment." After Jacobson's voluntary dismissal, Clack and NAS filed motions for attorneys' fees under the Anti-SLAPP Act, which authorizes awards for attorneys' fees and litigation costs to "a moving party who prevails, in whole or in part," on a special motion to dismiss under the Act. D.C. Code § 16-5504(a). They argued that Jacobson "misused the judicial system as a means to chill scientific debate" and caused them to "incur significant legal expenses to address baseless allegations and a discovery motion." Jacobson countered that because he had voluntarily dismissed his complaint, there was no "prevailing party" given that nobody had been "awarded [any] relief by the court." *See Settlemire v. D.C. Off. of Emp. Appeals*, 898 A.2d 902, 907 (D.C. 2006) ("Generally speaking, the term 'prevailing party' is understood to mean a party 'who has been awarded some relief by the court.'" (citations omitted)).

The trial court agreed with NAS and Clack that they could recover attorneys' fees and costs under the Anti-SLAPP Act. The court acknowledged that there are other contexts in which one is not considered to be a "prevailing party" unless the court orders some relief, but reasoned that those cases were not controlling because the Anti-SLAPP Act does not incorporate the strict concept of what it means to be a prevailing party that applies in other corners of the law. Instead, it authorizes fee awards to a broader class of litigants, including those who prevail only "in part." The judge reasoned that when a plaintiff voluntarily dismisses their suit after a special motion to dismiss has been filed, fee awards are authorized so long as the special motion to dismiss would have been granted but-for the voluntary dismissal.

In applying that approach, the judge determined that she would have granted the special motions to dismiss because (1) NAS and Clack made a prima facie showing that Jacobson's suit arose "from an act in furtherance of the right of advocacy on issues of public interest" and (2) Jacobson did not demonstrate that his defamation and related claims were "likely to succeed on the merits."[2] The judge also considered an alternative approach—that fees might be warranted only when the special motion to dismiss is what prompted the plaintiff's voluntary dismissal—

---

[2] The court also explained why Jacobson would not have succeeded on his breach-of-contract and promissory estoppel claims, but Jacobson has not challenged those rulings on appeal, so we do not discuss them further.

and concluded that fees would be warranted under that approach as well. The judge reasoned that the voluntary dismissal came just two days after a hearing on the special motions to dismiss where the court hinted it was going to grant the motions, and there was no "new event or information" that could plausibly explain Jacobson's abandonment of his suit, making it apparent that it was the special motions to dismiss that prompted Jacobson to dismiss his suit.

The court concluded there were no special circumstances that would make a fee award unjust and ultimately ordered Jacobson to pay NAS $428,723 (reflecting a 20% reduction from what NAS reported as its attorneys' fees) and Clack $75,000. Jacobson now appeals.

## II.

Jacobson raises two arguments. First, he contends that a voluntary dismissal extinguishes the ability of defendants to receive fee awards under the Anti-SLAPP Act because they have not "prevail[ed]" in the relevant sense. In the alternative, he asserts that the trial court erred in concluding that his defamation claims were not likely to succeed on the merits. We disagree on both fronts.

The proper interpretation of the Anti-SLAPP Act's fee-shifting provision raises questions of law that we review de novo. *Competitive Enter. Inst. v. Mann*,

150 A.3d 1213, 1233, 1240 (D.C. 2016). We first provide a brief overview of the Act before turning to the meaning of the critical language: "prevails, in whole or in part." Contrary to Jacobson's assertions, we conclude that plaintiffs cannot insulate themselves from orders to pay attorneys' fees by voluntarily dismissing their cases after special motions to dismiss have been filed.

## A. The Anti-SLAPP Act

The D.C. Council enacted the Anti-SLAPP Act to guard against "lawsuits filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view." D.C. Council, Comm. on Pub. Safety and the Judiciary, Report on Bill 18–893 at 1 (Nov. 18, 2010). It reasoned that such suits "are often without merit," and that the targets of these "strategic lawsuits against public participation" must devote substantial "money, time, and legal resources" to defending against them, "resulting in a chilling effect on the exercise of constitutionally protected rights." *Id.* One way the Act dissuades SLAPPs, and makes their targets whole, is by permitting awards of attorneys' fees to defendants who prevail on their motions to dismiss. The fee-shifting provision is an exception to the default "American rule" under which every party pays their own legal costs. *See Psaromatis v. Eng. Holdings I, LLC*, 944 A.2d 472, 490 (D.C. 2008).

The Act authorizes special motions to dismiss "any claim arising from an act in furtherance of the right of advocacy on issues of public interest" and also special motions to quash "a discovery order, request, or subpoena" in connection with such claims. D.C. Code §§ 16-5502(a), -5503(a). While a motion to dismiss is pending, the Anti-SLAPP Act instructs trial courts to generally stay discovery proceedings and hold an expedited hearing on the motion.[3] *Id.* § 16-5502(c). To secure a dismissal, the party seeking it has to make a "prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest." *Id.* § 16-5502(b). If that prima facie showing is made, the burden shifts to the plaintiff, who must demonstrate that their "claim is likely to succeed on the

---

[3] While this appeal was pending, this court decided *Banks v. Hoffman*, where a division of this court concluded that the Anti-SLAPP Act's discovery-limiting provisions violate the Home Rule Act. 301 A.3d 685, 690 (D.C. 2023). We asked the parties to file supplemental briefs addressing whether *Banks* affects the proper disposition of this appeal, but since those briefs were filed this court has vacated *Banks* and agreed to rehear it en banc. We therefore do not consider its application here because it no longer has any precedential force. In his supplemental brief, Jacobson makes a belated argument that the trial court erroneously limited his discovery, but he does not offer any reason to excuse his failure to raise the issue in his initial round of briefing, nor does he offer any plausible grounds on which additional discovery would have rendered his claims meritorious. We therefore decline to address this belated argument. *See Fells v. Serv. Emps. Int'l Union*, 281 A.3d 572, 579 n.3 (D.C. 2022) (holding that appellant "waived" argument by failing to raise it "in his opening brief" (citing *Stockard v. Moss*, 706 A.2d 561, 566 (D.C. 1997))); *Blades v. United States*, 200 A.3d 230, 236-37 (D.C. 2019) (treating as a discretionary decision whether this court will "elect" to address an argument first raised in a supplemental brief that a party has been given leave to file).

merits." *Id.* If the plaintiff cannot meet that burden, the motion to dismiss must be granted. *Id.* § 16-5502(b), (d).

A successful movant is presumptively entitled to a fee award; there is no requirement that the suit be a "classic" SLAPP, filed with an improper motive, or utterly devoid of merit. *Khan v. Orbis Bus. Intel. Ltd.*, 292 A.3d 244, 252-54 (D.C. 2023); *Doe v. Burke*, 133 A.3d 569, 573-74, 578 (D.C. 2016). Even plaintiffs who believe in good faith that their case is meritorious may be required to pay the other side's fees so long as the defendant satisfies the prima facie showing, the plaintiff fails to show a likelihood of success, and no special circumstances would render the fee award unjust.

### B. "Prevails in Whole or in Part"

This appeal asks us to decide when, if ever, a defendant who has filed a special motion to dismiss can be said to have prevailed in whole or in part where the plaintiff subsequently voluntarily dismisses their suit before the court rules on the motion.

*1. A voluntary dismissal is not a bar to attorneys' fees under the Act*

a. The text is ambiguous but favors permitting a fee award.

Jacobson first argues that "the Superior Court exceeded its authority" when it awarded attorneys' fees to Clack and NAS.[4] In examining whether the Anti-SLAPP Act permits an award of attorneys' fees against one who has voluntarily dismissed their suit, "our task is to search for an interpretation that makes sense of the statute and related laws as a whole." *Aboye v. United States*, 121 A.3d 1245, 1249 (D.C. 2015) (quoting *Richardson v. United States*, 927 A.2d 1137, 1139 (D.C. 2007)). Beyond the text of the particular provision, "we consider statutory context and structure, evident legislative purpose, and the potential consequences of adopting a given interpretation." *In re G.D.L.*, 223 A.3d 100, 104 (D.C. 2020). "[W]e may also look to the legislative history to ensure that our interpretation is consistent with legislative intent." *Facebook, Inc. v. Wint*, 199 A.3d 625, 628 (D.C. 2019) (quoting *Thomas v. Buckley*, 176 A.3d 1277, 1281 (D.C. 2017)).

Beginning with the text, the fee-shifting provision at issue here reads: "The court may award a moving party who prevails, in whole or in part, on a motion

---

[4] It is not entirely clear if Jacobson is raising a jurisdictional challenge to the court's post-dismissal award of attorneys' fees in addition to his principal argument that the Anti-SLAPP Act does not authorize attorneys' fees after a voluntary dismissal. To the extent he is raising one, it fails. Courts "may consider collateral issues after an action is no longer pending" following a voluntary dismissal. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990). Those "collateral issues" include awards of attorneys' fees, which involve "independent proceeding[s] supplemental to the original proceeding." *Id.* (quoting *Sprague v. Ticonic National Bank*, 307 U.S. 161, 170 (1939)).

brought under § 16-5502 [to dismiss] or § 16-5503 [to quash] the costs of litigation, including reasonable attorney fees." D.C. Code § 16-5504(a). It is not obvious from the text alone whether Clack prevailed in the underlying litigation by virtue of Jacobson's voluntary dismissal. On the one hand, a defendant arguably prevails whenever litigation ends with any stripe of dismissal of the claims against them. On the other hand, a voluntary dismissal under Rule 41(a)(1) is generally without prejudice, so it is only a qualified (and perhaps temporary) victory for the defendant. Another round of litigation might follow on its heels, should the plaintiff choose to refile their suit, so one might think the defendant has not truly prevailed in the relevant sense.

But while the text is ambiguous, there is at least one textual clue that a defendant can prevail under the Anti-SLAPP Act short of a court-ordered dismissal. The text of the District's Act simply does not say that a defendant prevails only when the court has ordered relief in their favor. That contrasts with several states' anti-SLAPP statutes that authorize fee awards only when "*the court grants*" a special motion to dismiss. Nev. Rev. Stat. § 41.670(1)(a) (emphasis added); Conn. Gen. Stat. Ann. § 52-196a(f)(1) (emphasis added); Mass. Gen. L. c. 231, § 59H (emphasis added); *see also Stubbs v. Strickland*, 297 P.3d 326, 329 (Nev. 2013) ("The plain language of [Nevada's statute] clearly conditions a defendant's ability to bring a separate action for damages and attorney fees in response to a SLAPP suit on the

district court's grant of a special motion to dismiss."). The fee-shifting provision at issue here speaks more broadly, applying to any party that "prevails, in whole or in part" on their special motion to dismiss, and that itself is a point against treating court-ordered relief as a prerequisite to a fee award when the text imposes no such restriction.

### b. Our precedents likewise favor permitting the award.

Jacobson argues that our precedents have already settled the issue here in his favor. He relies principally on *Settlemire*, where in the context of a different statute we explained that the phrase "prevailing party" is generally "understood to mean a party 'who has been awarded some relief by the court' (or other tribunal)." *Settlemire*, 898 A.2d at 907 (quotation omitted). But *Settlemire* did not purport to announce a hard-and-fast rule; it noted only that "[g]enerally speaking" the phrase "prevailing party" is a term of art that refers to one who has secured court-ordered relief. *Id.* And more importantly, that particular term of art does not appear in the Anti-SLAPP Act, which refers not to prevailing parties but to one who "prevails, in whole or in part." D.C. Code § 16-5504(a).

While the phrases are certainly similar, this court previously distinguished between the two in *Frankel v. D.C. Office for Planning and Econ. Dev't*, and noted that the "prevails in whole or in part" language sweeps more broadly than the

"prevailing party" concept discussed in *Settlemire*. 110 A.3d 553, 557 (D.C. 2015). *Frankel* concerned the District's Freedom of Information Act, which uses the same "prevails in whole or in part" language that we address today. We held in *Frankel* that the phrase "prevails in whole or in part" in the FOIA statute "suggests that the D.C. Council intended to authorize attorney's fees in FOIA cases more often than in other types of cases," even where the government entity voluntarily complies with the FOIA request without any court order to do so. *Id*. It is thus *Frankel*, rather than *Settlemire*, that is more instructive on the particular language we confront here, and *Frankel* rejects Jacobson's position that court-ordered relief is a prerequisite to attorneys' fees.

Jacobson responds with a grab-bag of additional cases that he argues establish that attorneys' fees are not available under the Anti-SLAPP Act absent court-ordered relief. Those cases do not provide him any meaningful support. He stresses this court's opinion *Khan*, in which we stated that "[s]ection 16-5504(a) authorizes fee awards to defendants only when the court has determined, in granting a special motion to dismiss, that the plaintiff is unable to show the claim is likely to succeed on the merits." 292 A.3d at 256. He also points to similar language from the D.C. Circuit's opinion in *Abbas v. Foreign Policy Group*, which says that the Anti-SLAPP Act "does not purport to make attorney's fees available to parties who obtain dismissal by" means other than a court order granting a special motion to dismiss.

783 F.3d 1328, 1337 n.5 (D.C. Cir. 2015). But neither *Khan* nor *Abbas* considered, and neither had cause to consider, whether attorneys' fees may be awarded under the Anti-SLAPP Act after a voluntary dismissal. So their broad pronouncements, while generally correct, are not universal truths and are not binding in all future unforeseen and unconsidered scenarios like the one before us today. *Murphy v. McCloud*, 650 A.2d 202, 205 (D.C. 1994) ("The rule of stare decisis is never properly invoked unless in the decision put forward as precedent the judicial mind has been applied to and passed upon the precise question." (citation omitted)); *Alfaro v. United States*, 859 A.2d 149, 154 n.8 (D.C. 2004) (language "entirely unnecessary for the decision of the case" is dictum and has "no effect as indicating the law of the District" (quotation omitted)).[5]

Jacobson next points to *Thoubboron v. Ford Motor Co.* for his assertion that attorneys' fees and costs cannot be awarded after a voluntary dismissal. 809 A.2d 1204 (D.C. 2002). In *Thoubboron*, we held that Rule 41(a)(2) allows the award of attorneys' fees after a court-ordered dismissal "upon such terms and conditions as the court deems proper." *Id.* at 1210-11. Jacobson argues that because that phrase does not appear in the portion of Rule 41(a)(1) governing voluntary dismissals, the

---

[5] As a D.C. Circuit opinion post-dating February 1, 1971, *Abbas* is also not binding on this court. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

implication is courts have no authority to impose fee awards under that section of the rule. Whether he is right about that implication or not—*Thoubboron* never mentions Rule 41(a)(1)—is entirely beside the point here. Clack and NAS were not awarded fees under any portion of Rule 41, so its application is immaterial (that court rule does not supersede or restrict the Anti-SLAPP Act). *Thoubboron* simply had nothing to do with a statutory fee-shifting provision like the one in the Anti-SLAPP Act.

Finally, Jacobson points to *Doe v. Burke*, an Anti-SLAPP case in which we expressed the sentiment that "[h]ad [the plaintiff] wished to minimize her potential exposure to a fee award, she could have dismissed her lawsuit at any time, rather than continue after [the defendant] rejected her settlement offer." 133 A.3d 569, 578-79 (D.C. 2016). But minimizing exposure to a fee award is not the same thing as avoiding it altogether. Jacobson, too, could have significantly minimized his exposure to a fee award had he dismissed his suit at an earlier stage. As it stands, however, he merely reduced his losses by dismissing his suit when he did, without completely eliminating them.

### c. The purposes of the Anti-SLAPP Act favor permitting the award.

Because neither the plain text nor our prior precedents resolve the issue, we now examine the legislative history and purposes of the Anti-SLAPP Act to

elucidate whether attorneys' fees were permitted here. *See Clement v. D.C. Dep't of Emp. Servs.*, 126 A.3d 1137, 1140 (D.C. 2015) ("Where a statute is ambiguous, the statute's legislative history is relevant in determining its appropriate meaning."). The drafting history of the Anti-SLAPP Act makes clear that the D.C. Council's choice of the words "prevails, in whole or in part" was quite deliberate. The draft legislation originally permitted fee awards only to one who had "substantially prevail[ed]." Comm. Rep. on Bill 18-893, draft legislation at 3. The Council eased that requirement—thereby broadening the availability of attorneys' fees—so that one needed only to prevail "in part" to receive attorneys' fees, and it made that change "to better reflect the intent of" the drafters. Dec. 7, 2010 Legis. Meeting Hr'g at 1:37:20-58 (statement of Councilmember Mendelson). That drafting history suggests the Council meant to give trial courts considerable leeway in granting fee awards, contrary to the more rigid view that Jacobson now advances.

The purposes of the Anti-SLAPP Act also counsel against Jacobson's rigid reading of the fee-shifting provision. If Jacobson were correct that a voluntary dismissal nullifies any right to attorneys' fees, then plaintiffs could inflict the harm the Anti-SLAPP Act was meant to combat—siphoning defendants' money, time, and resources—without recompense. Before Jacobson voluntarily dismissed his suit, Clack and NAS's defense teams had already expended significant resources in responding to Jacobson's complaint, briefing their motions to dismiss, opposing

Jacobson's discovery requests, and attending hearings. Lawyers for Clack and NAS spent roughly one thousand hours working on the case. The trial court calculated their combined reasonable attorneys' fees at around half-a-million dollars. A defendant on course to prevail on their special motion to dismiss should not be at the mercy of a plaintiff who might strategically voluntarily dismiss their suit to avoid paying an imminent fee award.

Strengthening this conclusion is the fact that, by rule, a plaintiff may voluntarily dismiss their suit *without prejudice* once as a matter of right. D.C. Super. Ct. Civ. R. 41(a)(1)(B). So under Jacobson's preferred approach, a plaintiff could engage in harassing and meritless litigation up until the point at which they sense the court might dismiss the case, and then voluntarily dismiss the suit themselves, all the while keeping the threat of refiling hanging over the defendants' heads and running up their legal bills. The specter of repeat litigation by Jacobson is not farfetched. In his briefing to this court, Jacobson continues to take issue with "the refusal of Dr. Clack and NAS to correct the false facts to this day, in reckless disregard for the truth." Much of his brief rehashes his claims that NAS and Clack defamed him and he persists in condemning Clack's article. In arguing that NAS

and Clack have not "prevailed," Jacobson repeatedly asserts that he retains the ability to refile his defamation suit, "keeping the defendant[s] at risk."[6]

### 2. NAS and Clack prevailed under each of the potential tests

We now turn to the standard for determining when, after a plaintiff's voluntary dismissal, a defendant can be said to have "prevail[ed], in whole or in part" under the Anti-SLAPP Act. There are a few options on the table, but ultimately we do not opine on which is the appropriate test because NAS and Clack have prevailed under any of them. That is sufficient to uphold the fee award here, and we save for another day which of these tests ought to apply in this scenario.

The first option is what we call a merits-based approach, where the trial court must determine whether the motion to dismiss would have succeeded but-for the voluntary dismissal. *See, e.g.*, *Roe v. Halbig*, 240 Cal. Rptr. 3d 104, 118 (Ct. App. 2018) ("requir[ing] that the trial court determine the merits of the anti-SLAPP motion to strike notwithstanding the prior dismissal of the underlying suit"); *Pfeiffer Venice Props. v. Bernard*, 123 Cal. Rptr. 2d 647, 652 (Ct. App. 2002) ("[T]he trial court must, upon defendant's motion for a fee award, rule on the merits of the SLAPP

---

[6] Notably, Jacobson would now likely be barred from filing a new suit by the statute of limitations for defamation claims. D.C. Code § 12-301(4).

motion even if the matter has been dismissed prior to the hearing on that motion."). That is the dominant approach in California, the jurisdiction with the most robust body of anti-SLAPP precedents.[7]

The second option we call the catalyst approach, where the question is whether the special motion to dismiss is what prompted the plaintiff to voluntarily dismiss their suit. *See Frankel*, 110 A.3d at 556-58 (adopting catalyst approach to FOIA fee awards); *see also Chinese Consol. Benevolent Assoc. v. Chin*, 504 P.3d 1196, 1199 (Or. App. 2021) (anti-SLAPP fee awards unwarranted where "plaintiff's dismissal was 'for reasons having no relation to the pendency of the special motion to strike'").

The third option we call the *Coltrain* approach, which tweaks the catalyst approach a bit by presuming that a defendant has prevailed whenever their special motion to dismiss precedes the plaintiff's voluntary dismissal. *See Coltrain v.*

___

[7] Jacobson argues that "this court has held that California precedent cannot be used to construe D.C.'s Anti-SLAPP Act," citing to *Saudi Am. Pub. Rels. Affs. Comm. v. Inst. for Gulf Affs.*, 242 A.3d 602, 611 (D.C. 2020). He is wrong about that. That case says only that this court will not invariably or "selectively follow other state court decisions," including those of California, but instead we must engage in the "basic principles of statutory interpretation" in interpreting the District's distinct Anti-SLAPP Act. *Id.* We in no way suggested that California's precedents could have no persuasive force in interpreting our Act, and indeed we have since relied on California precedents in this arena given "that state's similar anti-SLAPP statute." *Am. Stud. Ass'n v. Bronner*, 259 A.3d 728, 746 (D.C. 2021).

*Shewalter*, 77 Cal. Rptr. 2d 600, 608 (Ct. App. 1998). But that is merely a presumption, and a plaintiff can rebut that presumption by demonstrating that "it actually dismissed" for "reasons unrelated to the probability of success on the merits." *Id.*

### a. NAS and Clack prevailed under the merits-based approach.

The trial court endorsed a merits-based approach so we begin our analysis there. Under this approach, where a defendant files a special motion to dismiss and a plaintiff then voluntarily dismisses their suit, a trial court is required to adjudge the merits of the special motion to dismiss to determine if attorneys' fees and costs should be awarded.

Applying the merits-based inquiry to the facts here, the trial court correctly concluded that the special motions to dismiss would have been granted had Jacobson not voluntarily dismissed his suit before that could happen. Again, a court must grant a special motion to dismiss under the Anti-SLAPP Act if (1) the defendant makes a prima facie showing of protected activity and (2) the plaintiff cannot show a likelihood of success. D.C. Code § 16-5502(b). On appeal, Jacobson does not dispute that Clack and NAS have made out a prima facie case that their complained-

of conduct "arises from an act in furtherance of the right of advocacy on issues of public interest."[8] *Id.*

Jacobson focuses solely on the second part of the inquiry and argues that his "defamation case would likely have prevailed on its merits." For a public figure like Jacobson to succeed on a claim for defamation,[9] he must prove, among other things, "that the defendant made a false and defamatory statement" about him, and did so with "actual malice." *Mann*, 150 A.3d at 1240-41 (quoting *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005)). Jacobson has no plausible hope of making that showing. Jacobson instead has asked the District's courts to resolve a scientific debate, and that is something we are generally neither equipped to do, nor permitted to do by the First Amendment. Jacobson has not pointed to any ad hominem attacks or other statements that could fairly be described as defamatory, nor has he pointed to any

---

[8] That was a wise concession. The Clack article clearly meets the definition of "an act in furtherance of the right of advocacy on issues of public interest." "Issue[s] of public interest" expressly include those related to "environmental, economic, or community well-being." D.C. Code § 16-5501(3). A debate over the feasibility of renewable energy readily fits that definition.

[9] Jacobson concedes that he is a public figure and that the actual malice standard applies to his defamation claims, so we do not independently scrutinize those concessions.

indication of malice aside from Jacobson's own insistence that he is right and Clack is wrong (classic fodder for academic debate).

Jacobson argues that four statements in the Clack article "are unambiguously false statements of fact, or opinions that imply a verifiably false fact." But to even recount the allegedly false statements lays bare that he is seeking to drag a scientific debate into court under the auspices of defamation law. To illustrate, Jacobson alleges that (1) Clack falsely stated that the values in Table 1 of Jacobson's article were maximum values when they were in fact average values; (2) Clack falsely stated that he was unaware of any explanation for the large peak discharge of hydropower depicted in three figures in the Jacobson article; (3) Clack falsely claimed that the annual hydropower output represented in Jacobson's article was higher than historical averages; and (4) Clack falsely asserted that Jacobson's work contained modeling errors. To even form an opinion on whether Jacobson is correct would require so deep an understanding of the relevant science that these debates lie squarely within the realm of scientific debate—who is right on these matters is not something that defamation law polices. And Jacobson has aired his counterpoints within that very scientific debate—contemporaneously alongside Clack's article, no less—so that if he is really as obviously correct as he insists that he is, he surely will have suffered no ill effects in the relevant scientific community (because he will have bested his critics).

Jacobson counters by pointing to *Mann*, which involved defamation claims over several blog posts that accused the plaintiff, a climate scientist, of professional misconduct, data manipulation, and other wrongdoing. 150 A.3d at 1243. We allowed some of the claims in *Mann* to proceed beyond an Anti-SLAPP motion to dismiss in light of the fact that the defendant there had made overt claims of misconduct and colorfully impugned the plaintiff's integrity by, for example, calling him "the Jerry Sandusky of climate science" and likening him to Bernie Madoff.[10] *Id.* There are no similar statements here that would permit us to describe this as anything but a quintessential academic disagreement.

As this court did in *Mann*, we must carefully police the line between where reasoned scientific disagreement ends and defamation law begins: "[W]hen the issue is whether liability may be imposed for speech expressing scientific or policy views, the question is not who is right; the First Amendment protects the expression of all ideas, good and bad." *Id.* at 1242. Scientific debates over methodology and conclusions, "even with pointed language," enjoy First Amendment protection. *Id.*

---

[10] "Jerry Sandusky is a notorious convicted child sexual abuser and former assistant football coach at Penn State who was making front-page news at the time" of the blogposts, and "Bernie Madoff is a convicted criminal who swindled billions of dollars from thousands of investors and charities through a massive Ponzi scheme." *Mann*, 150 A.3d at 1243 n.36.

Clack's claims fall comfortably on the scientific debate side of the line so that Jacobson's defamation suit had no likelihood of success.

What animates Jacobson's $10 million defamation suit is nothing more than his indignation at an article critical of his work. Such criticism comes with the territory of academic debate. Jacobson is not without recourse, but his recourse lies not in this nation's courts, but in the marketplace of ideas where NAS itself has afforded him the opportunity to combat Clack's critiques, and Jacobson wisely availed himself of that opportunity. For all we know Jacobson has the better of the scientific debate, but that is not for us to say, nor would it be a happy development if this nation's courts held themselves out as the final arbiters of such academic disputes via defamation suits. Thankfully the First Amendment precludes us from taking on that role.

### b. NAS and Clack prevailed under the catalyst and *Coltrain* approaches.

Our conclusion is even more straightforward under the catalyst and *Coltrain* approaches, which are closely related. Under either approach, the question is ultimately whether the special motions to dismiss are what triggered Jacobson to dismiss his suit, or if instead something else prompted him to do so. The trial court cogently explained that the timing of Jacobson's dismissal made it fairly obvious that it was the special motions to dismiss that prompted him to dismiss his suit.

Jacobson dismissed just two days after a hearing on those motions and, as the trial judge understated things, the court's "concerns regarding the merits of [Jacobson's] case were likely evident" at that hearing. The court further noted that there was no "new event or information" that provided an alternative plausible explanation for Jacobson's dismissal.

While Jacobson now argues vociferously that this court should reject any version of a catalyst approach,[11] he does not challenge the trial court's conclusion that under a catalyst approach, NAS and Clack have prevailed. So he has effectively conceded the point, and in any event we see no basis to doubt the trial court's conclusion on this score. And Jacobson could fare no better under the *Coltrain* approach, which is even friendlier to NAS and Clack because it would trigger a presumption that they have prevailed (and Jacobson presented no evidence to rebut it).

---

[11] Jacobson asserts that this court "reject[s] the catalyst theory in non-FOIA contexts." *Fraternal Ord. of Police, Metro. Lab. Comm. v. District of Columbia*, 113 A.3d 195, 200 (D.C. 2015). It is true, as we noted in that case, that this court has on occasion rejected the catalyst theory in non-FOIA contexts, but we have never purported to foreclose the catalyst approach outside of FOIA cases entirely. *Id.*

Without adopting any of the particular approaches outlined above, it is enough here to say that NAS and Clack prevailed under any of the potential approaches to assessing that question. We therefore affirm the fee award in their favor.

**III.**

Finally, we address NAS and Clack's argument that they are owed additional attorneys' fees incurred in litigating Jacobson's motion for reconsideration, motion for relief from judgment, and this appeal. Because this work involved protecting the underlying judgment, additional fees may be appropriate. *See, e.g.*, *Easley v. Collection Serv. of Nev.*, 910 F.3d 1286, 1292 (9th Cir. 2018); *Friolo v. Frankel*, 942 A.2d 1242, 1253 (Md. 2008); *Young v. New Process Steel, LP*, 419 F.3d 1201, 1204 (11th Cir. 2005). The statute under which NAS and Clack were awarded fees is not limited to trial work but generally encompasses "the costs of litigation," § 16-5504(a), and post-trial motions and appeals are quite clearly part of the litigation. We thus remand to the trial court for it to consider whether NAS and Clack should be awarded additional attorneys' fees for the work they have done in defending the earlier fee award. *D.C. Metro. Police Dep't v. Stanley*, 951 A.2d 65, 67-68 (D.C. 2008) (per curiam) ("[W]here a party seeks to recover statutorily authorized attorney's fees for work completed on an appeal to this court, the request normally should be submitted to the trial court in which the proceeding arose.").

**IV.**

For the foregoing reasons, the judgment of the Superior Court is affirmed, and the case is remanded so that the trial court may consider awarding additional attorneys' fees and costs to Clack and NAS.

*So ordered.*

DEAHL, *Associate Judge*, concurring: I write separately because I think we should resolve the question left open in Part II.B.2 of the court's opinion. That is, how should trial courts assess whether a defendant has prevailed on an Anti-SLAPP motion to dismiss when the plaintiff voluntarily dismisses their suit prior to a ruling on the motion?[1] That question was thoroughly considered by the trial court and is

---

[1] The question presumes that plaintiffs should be able to voluntarily dismiss their suits after a special motion to dismiss has been filed, which I think is dubious. Voluntary dismissals are permitted as of right under Rule 41(a)(1)(A)(i) only "before the opposing party serves either an answer or a motion for summary judgment." We have opined that Anti-SLAPP motions to dismiss are "substantively the same" as motions for summary judgment, *Mann*, 150 A.3d at 1238 n.32, so there is at least an argument that the filing of a special motion to dismiss precludes a voluntary dismissal under Rule 41(a)(1)(A)(i). It is for all intents and purposes a summary judgment motion (which expressly precludes voluntary dismissal under that rule). But nobody made that argument in the trial court, nor is anybody making that argument before us, so I would not resolve this case on that ground. And perhaps the matter is better left to the rulemaking process, where Rule 41 could simply be

examined in the briefs before us, the potential answers to it have been exhaustively considered in other jurisdictions, and I do not see a particularly good reason to dodge the question now and leave trial courts to their own devices when answering it.

Like the significant majority of courts that have considered the issue in the anti-SLAPP context, I would conclude that a merits-based approach is the most sensible one. That is the dominant approach in California, the state with the most robust body of anti-SLAPP precedents, with *Coltrain*'s rebuttable presumption approach as an oft-criticized outlier. *See, e.g.*, *Tourgeman v. Nelson & Kennard*, 166 Cal. Rptr. 3d 729, 738 (Cal. Ct. App. 2014) ("[D]isagreeing with *Coltrain*" and concluding that "the trial court's adjudication of the merits of a defendant's motion [to dismiss] is an essential predicate to ruling on the defendant's request for an award.") (citing *Moore v. Liu*, 81 Cal. Rptr. 2d 807, 812 (Cal. Ct. App. 1999)). This merits-based approach best aligns with the policy judgments underlying our Anti-SLAPP Act. The Act's fee-shifting provision is meant to provide recompense to defendants who have been subjected to unmeritorious suits that target their rights of advocacy on issues of public interest. *See Khan*, 292 A.3d at 258 ("[C]ompensating defendants for litigation expenses they should not have had to bear" is among the

___

amended to include special motions to dismiss as filings that terminate a plaintiff's right to voluntarily dismiss their case.

Act's "important purpose[s].") There is no way to determine whether a defendant has been subjected to an unmeritorious SLAPP without walking through the relevant statutory calculus: (1) has the defendant made out a prima facie showing that the suit targets "an act in furtherance of the right of advocacy on issues of public interest," and if so, (2) has the plaintiff nonetheless demonstrated a likelihood of success on the merits. *Id*.

If they have been subjected to an unmeritorious SLAPP, then a plaintiff's voluntary dismissal should not preclude them from recovering fees just because the plaintiff had some other reason, unrelated to the merits, for dismissing their suit.[2] Regardless of the plaintiff's motives for dismissing—a determinative factor in the catalyst and *Coltrain* approaches—the defendant has still had to devote money, time and resources to defending against a meritless SLAPP, so that a potential fee award is warranted to offset the chilling effect of the suit. On the flipside, the catalyst and *Coltrain* approaches would offer unwarranted boons to defendants in scenarios where plaintiffs abandon meritorious suits in response to special motions to dismiss.

---

[2] The calculus might be different if the plaintiff voluntarily dismisses their suit before the defendant files a special motion to dismiss. In that case, it is much harder to conclude that a defendant has succeeded on a special motion to dismiss when the case was already dismissed before its filing. *See S. B. Beach Props. v. Berti*, 138 P.3d 713, 714 (Cal. 2006) ("defendants may not recover their attorney fees and costs" if voluntary dismissal precedes anti-SLAPP motion to dismiss).

The defendant's motion to dismiss might have been frivolous, but the prospect of racking up attorneys' fees may have simply scared the plaintiff into dismissing an otherwise meritorious suit that the Anti-SLAPP Act did not mean to deter.  That is why there must be some accounting of whether the motion to dismiss would have been successful, but-for the plaintiff's decision to voluntarily dismiss, when determining whether attorneys' fees should be awarded.

Examining the merits complies with the statute's purpose and prevents plaintiffs from undermining the fee-shifting provision with well-timed voluntary dismissals.  As one California court has noted, in criticizing the alternative approaches and adopting a merits-based approach, some judicial assessment of the merits is critical before awarding or denying fees because without that "a plaintiff's voluntary dismissal of the action could have the effect of (1) depriving a true SLAPP defendant of statutorily authorized fees or (2) entitling a defendant to such relief in a non-SLAPP action which was dismissed by the plaintiff for entirely legitimate reasons." *Moore*, 81 Cal. Rptr. 2d at 812.

While I take no issue with what the court's opinion says, I think it should say more.  We should further hold that a merits-based approach applies when a plaintiff voluntarily dismisses their suit before the trial court rules on a pending special motion to dismiss.